NORTHERN ILLINOIS MEDICAL CENTER, Plaintiff-Appellant, v. HOME STATE BANK OF CRYSTAL LAKE, Trustee, Defendant-Appellee.—MEMORIAL HOSPITAL FOR McHENRY COUNTY, Plaintiff, v. HOME STATE BANK OF CRYSTAL LAKE, Trustee, Defendant.—CRYSTAL LAKE HOSPITAL ASSOCIATION *et al.*, Plaintiffs-Appellants, v. HOME STATE BANK OF CRYSTAL LAKE, Trustee, Defendant-Appellee (Neil F. Hartigan, Attorney General, Intervening-Appellant; The City of Crystal Lake, Intervening-Appellee).

Second District    Nos. 2—84—0628, 2—84—0629, 2—84—0648 cons.

Opinion filed August 30, 1985.

Neil F. Hartigan, Attorney General, of Springfield, *pro se* (Floyd D. Perkins, Assistant Attorney General, of Chicago, of counsel), for appellant Neil F. Hartigan.

Jeffrey R. Ladd and Lawrence M. Gavin, both of Boodell, Sears, Giambalvo & Crowley, of Chicago, for appellant Northern Illinois Medical Center.

Richard E. Travis, of Sheflow, Rydell, Travis & Kirkland, of Elgin, for appellants Crystal Lake Hospital Association and Sherman Hospital.

Richard G. Flood, Andrew T. Freund, and Richard R. Zukowski, all of Zukowski, Poper, Rogers & Flood, and Michael F. Kukla, of Cowlin, Ungvarsky, Kukla & Curran, both of Crystal Lake, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

This opinion addresses three separate appeals which have been consolidated for the purposes of our review. Northern Illinois Medical Center (hereinafter NIMC) plaintiff-appellant in appeal No. 84—0628, the Crystal Lake Hospital Association and Sherman Hospital, (hereinafter collectively referred to as CLHA or Crystal Lake Ambutal) plaintiffs-appellants in appeal No. 84—0648, and the Attorney General of the State of Illinois, intervenor-appellant, in appeal No. 84—0629, each appeal from the trial court's judgment denying the plaintiff medical health care organizations status as beneficiaries under a charitable testamentary trust established by paragraph 11 of the last will and testament of Thomas W. Ames.

The following issues have been raised for our consideration: (1) whether this court should engage in an independent analysis of the record and resolve the instant cases as a matter of law; (2) whether the doctrines of *res judicata* and/or collateral estoppel preclude NIMC, Crystal Lake Ambutal, and the Attorney General from maintaining the instant actions; (3) whether the plaintiff medical health care facilities qualify as beneficiaries under a reasonable construction of Mr. Ames' charitable testamentary trust; (4) whether the plaintiff medical health care facilities are entitled to the proceeds of the charitable testamentary bequest under the doctrine of equitable deviation; and (5) whether the trial court erred in excluding certain evidence on the grounds of relevance and materiality.

Thomas W. Ames died on February 8, 1963. In his last will and testament, he left the bulk of his estate, valued at $850,000 at the time of trial, in trust for the charitable purpose of establishing a hospital in or near the city of Crystal Lake within 20 years of his death. Defendant, the Home State Bank of Crystal Lake was named as trustee of the testamentary trust and has continuously served as trustee from October 10, 1966, to the present.

All three consolidated appeals center on the construction and enforcement of the charitable testamentary trust bequest, which is set forth in paragraph 11 of Mr. Ames' will and provides, in relevant part:

"Eleventh: After the payment of the items hereinabove provided *** I then hereby give, devise and bequeath all of the rest, residue and remainder of my estate, ***, unto the HOME STATE BANK OF CRYSTAL LAKE, 40 Grant Street, Crystal Lake, Illinois, IN TRUST, nevertheless, as Trustee for the following uses and purposes: I direct said Trustee to sell and convert into cash all of the rest, residue and remainder of my estate, as aforesaid, at either public or private sale, for such price or prices as it may deem best as soon as practicable after my decease and to use and apply the proceeds realized therefrom toward the cost of incorporating and establishing a not-for-profit hospital association or foundation in or near the City of Crystal Lake, Illinois, and toward the cost of erecting, constructing and maintaining of a hospital building or buildings and also toward the cost of the operation of such hospital when so constructed for the diagnosis, treatment, medical care and cure of sick, injured and diseased persons. I direct further that such hospital association or foundation be so incorporated and established, the hospital building or buildings erected and the hospital operating as such within twenty (20) years after my decease, and said Trustee is hereby given the right to select the location and site for such hospital building or buildings in or near the City of Crystal Lake, Illinois, as aforesaid. In the event, however, that said Hospital association or foundation is not so incorporated or established, the hospital building or buildings not erected and the hospital not operating as such within said twenty-year period after my decease, then and in that event I hereby direct said Trustee to use and apply such proceeds in its hands from the sale of the rest, residue and remainder of my estate, as aforesaid, toward the sponsoring of whatever other public or worthwhile charitable cause or project said Trustee in its good judgment and discretion may consider for the best interest and welfare of the people residing in or near the City of Crystal Lake, Illinois. When the above purpose has been accomplished and if it is feasible to do so, it is my wish and will that such hospital or other project be named in my memory."

Paragraph 11 essentially delineates six requirements which must be satisfied by an organization seeking to qualify as a recipient beneficiary under its terms. A qualifying beneficiary must establish: (1) first, that it is a not-for-profit hospital, association, or foundation, not in existence at Mr. Ames' death; (2) second, that it is located "in or

near" the city of Crystal Lake; (3) third, that it is a hospital constructed for the diagnosis, treatment, medical care and cure of sick, injured and diseased persons; (4) fourth, that it was operating as a hospital on February 8, 1983, within 20 years of Mr. Ames' death; (5) fifth, that the trust provision gave the trustee the right to select the location and site for the hospital; and (6) sixth, that the new facility is to be named in memory of Thomas W. Ames, if it is feasible to do so.

The consolidated cases underlying the instant appeals represent a second attempt by NIMC and Crystal Lake Ambutal to obtain the Ames trust proceeds. In 1975, a prior action was instituted by Crystal Lake Ambutal against Home State Bank, as trustee, seeking the trust monies. NIMC, formerly McHenry Hospital, was permitted to intervene in the 1975 suit. Following a bench trial, Judge Michael J. Sullivan issued a memorandum opinion on July 1, 1981, delineating his express finding that Crystal Lake Ambutal was not a "hospital" within the provisions of the Ames trust. In a subsequent September 17, 1981, order, the court entered its further finding that McHenry Hospital (currently NIMC) was not "in or near the City of Crystal Lake" as contemplated by the Ames trust. In entering judgment against all plaintiffs, the court noted "that at the time of entry of this Order, the cause is not ripe for the application of the doctrine of *cy pres* or any other such equitable doctrine," indicating that its decision was based solely on its construction of the trust provisions and that it did not consider any equitable theory. Neither plaintiff appealed the earlier 1981 decisions.

Plaintiff, NIMC is an Illinois not-for-profit corporation formed on June 7, 1982, as a result of a major corporate reorganization of McHenry Hospital. Evidence adduced at trial showed that McHenry Hospital was incorporated on March 16, 1956, and was in existence both prior to the time Thomas Ames executed his will on August 30, 1962, and prior to the date of Ames' death on February 8, 1963. All assets and liabilities of McHenry Hospital were transferred to NIMC and to two other successor corporations. Both NIMC and McHenry operate under the same license and share many of the same employees. Old McHenry Hospital had 40 beds and, after an expansion, was increased to 136 beds.

In August 1981, the Illinois Department of Health approved NIMC's application for a new 180-bed hospital facility. At the time of the second trial (May 1984), the new NIMC facility was 95% complete; however, it was not scheduled to be finished and operational until June 15, 1984, more than 20 years after Ames' death. The projected bed capacity has been increased to 195.

NIMC's new facility is located at Route 31 and Bull Valley Road within the city of McHenry. At trial, consulting engineer John Smith testified concerning the distances and travel times between the new NIMC facility and the city of Crystal Lake. Smith informed the court that NIMC's new facility is located approximately 4.18 miles and five minutes away on Route 31 from the northern boundary of Crystal Lake, 2.23 miles nearer than NIMC's previously existing facility. Smith also characterized the travel route along Route 31 between the northern border of Crystal Lake and the new NIMC facility as rural, with no stop signs or stoplights. However, on cross-examination he noted that depending on where a Crystal Lake resident resided, he had to travel past commercial enterprises, retail establishments, a residential subdivision, other municipalities, and a railroad crossing to reach the new facility. Smith also admitted that his measurements were only from the northern boundary of Crystal Lake and that he was unaware of the location of Crystal Lake's other geographic boundaries. Smith also measured the distance from Crystal Lake to Memorial Hospital and found Memorial to be 6.63 miles and 9.9 minutes away. A map depicting Smith's measurements was admitted into evidence by the court.

Statistics introduced at trial also showed that in 1981 the old NIMC (formerly McHenry Hospital) facility, located in the business district of the city of McHenry, admitted 9.7% of its in-patients from Crystal Lake. Similar NIMC admissions ranging from 12.1% in 1979 to 8.4% in 1983 were reported for the years immediately prior and subsequent to 1981. No admission figures for the new NIMC facility were available, as it was not operating at the time of trial. NIMC's board of directors have also indicated a willingness to name a portion of the new NIMC facility in memory of Thomas W. Ames if his charitable bequest is distributed to it.

In 1978, Sherman Hospital established prior to Ames' death in 1963 and located in Elgin, approximately 12.6 miles and 9.9 minutes from the nearest boundary of Crystal Lake, began to operate an ambulatory care facility known as the "Crystal Lake Ambutal." Ambutal is a not-for-profit corporation and was operational within the 20-year trust limitation period. The Crystal Lake Ambutal is located within the corporate boundaries of Crystal Lake, and approximately 50% of the out-patients treated at the facility are residents of Crystal Lake.

Ambutal is not licensed as a hospital by the Illinois Department of Public Health and operates under Sherman Hospital's license. It does not have certificate of need approval from the Illinois Health Facilities Planning Board. Ambutal also does not provide in-patient hospital

care.

At trial, John Graham, president and chief executive officer of Sherman Hospital, testified that, as of the time of trial, Ambutal's out-patient services included an emergency room, a trauma room, a clinical laboratory, a blood bank, respiratory treatment, cardiac rehabilitation, a four-bed kidney dialysis department, an educational and speech facility, a pre- and post-natal care facility, a limited overnight observation facility, an emergency response system for the elderly, a minor surgical suite, an X-ray department, EKG services, and a neurodiagnostic service.

Graham did note, however, that Ambutal does not have an obstetrics department, a pediatric department or a pharmacy, and is not equipped to do sophisticated laboratory analysis or provide radium therapy. Babies are only delivered at the Ambutal facility in emergency situations, and only five births have occurred in the facility's short history. Graham also noted that Ambutal is not equipped to provide general anesthesia or intensive care to its patients.

Ambutal has indicated that it would be willing to name a portion of its facility in memory of Thomas W. Ames should it be awarded the trust proceeds.

The following facts relating to the plaintiffs' early efforts to establish a hospital in Crystal Lake within the 20-year trust limitation period were introduced into evidence by way of written stipulations and accompanying exhibits as agreed to by all parties. These stipulations and exhibits showed that in May 1969, the Hospital Planning Council for Metropolitan Chicago adopted a resolution which required McHenry Hospital, Memorial Hospital, and the Crystal Lake Hospital Association (CLHA), a group formed for the purpose of establishing a hospital in Crystal Lake, to work together toward the establishment of a regional health care facility serving all of the neighboring areas. After several unsuccessful efforts by the three organizations, Memorial Hospital withdrew from the project. Shortly thereafter, McHenry Hospital (NIMC) and the Crystal Lake Hospital Association (Ambutal) explored alternative sites. Two new sites came under consideration: Site A, favored by McHenry Hospital, was located on the east side of Route 31, approximately 2½ miles south of Route 120 and approximately 4½ miles north of Route 176. Site B, favored by CLHA and located within the city of Crystal Lake, is the present site of the Crystal Lake Ambutal. McHenry Hospital and CLHA retained A.T. Kearney and Company, an international consulting firm, to evaluate the two sites. Kearney prepared and submitted a "Site Selection and Evaluation Study Report," on September 3, 1971. While the report

concluded that either site could be used for a new hospital, it recommended that Site B be selected as the location for the joint health facility. In response to a subsequent inquiry by McHenry Hospital, the consulting firm sent a letter dated November 24, 1971, to McHenry reaffirming its position that "it is the A.T. Kearney recommendation that the southern [Crystal Lake] site be selected for the proposed Regional Health Park ***. The northern [McHenry] site should be selected if the southern site could not be obtained ***. The southern site is definitely the preferred site."

On October 1, 1971, McHenry Hospital and the CLHA jointly acquired an option to purchase "Site B." They then filed an application to rezone the property. The Home State Bank, as trustee, was not consulted and did not take part in the purchase of the option, or the rezoning application.

On April 10, 1972, before Site B was rezoned, Clara Stilling offered to donate 40 acres of land located at the southwest corner of the intersection of Route 31 and Bull Valley Road to McHenry Hospital and to give McHenry Hospital an option for the purchase of 60 additional adjacent acres. This land was approximately one-quarter mile north of Site A. On April 18, 1972, McHenry Hospital's board of directors voted to accept the offer and on April 21, 1972, it gave written notice of acceptance. The Home State Bank, as trustee, was not consulted concerning this acquisition, and there were no communications between the Home State Bank and McHenry Hospital concerning the Stilling property. At this point, the joint venture fell apart. McHenry Hospital indicated its preference for the Stilling (McHenry) location, while CLHA expressed its preference for the Site B (Crystal Lake) location, as the future sites of the proposed health park. Consequently, CLHA purchased McHenry Hospital's interest in the option to purchase Site B.

In July 1972, McHenry Hospital received an initial permit from the Illinois Department of Public Health which authorized it to prepare architectural plans and specifications for construction on the Stilling property. The site was subsequently annexed by the city of McHenry and rezoned, feasibility experts were retained, and preliminary architectural plans were prepared. In May of 1974, McHenry Hospital submitted a preliminary application for financing to the Illinois Health Facilities Authority. The first stage of the review was completed in June 1974. Before the second stage of the review was completed, however, the Illinois Health Facilities Planning Act became effective. (Ill. Rev. Stat. 1983, ch. 111½, par. 1151 *et seq.*) The Act required the sponsor of a new hospital to obtain a "Certificate of

Need" permit from the Health Facilities Planning Board before a new hospital could be erected. As a result of this legislation, McHenry Hospital temporarily abandoned its efforts to construct a new facility.

In 1979, McHenry Hospital again explored with Memorial Hospital the feasibility of jointly developing a hospital facility. In accord with consultants' recommendations, McHenry Hospital adopted a resolution to merge with Memorial; however, Memorial did not adopt a reciprocal resolution, and McHenry's efforts to establish a new facility were again disbanded.

McHenry Hospital then reconsidered the possibility of building a new hospital on the Stilling site. In August 1981, it obtained "Certificate of Need" approval from the Illinois Health Facilities Planning Board. In June 1982, McHenry underwent corporate reorganization and established its NIMC subsidiary. A new hospital was then constructed by NIMC on the Stilling location; however, its new hospital was not operational until June 1984, more than 20 years after Ames' death.

While NIMC established its new facility, CLHA also considered establishing its own hospital on the Site B location. In November of 1972, officers of CLHA approached Sherman Hospital about the possibility of constructing a satellite hospital on Site B. A series of meetings were held, and on November 8, 1973, the board of managers of Sherman Hospital adopted a resolution approving the construction of a 125-bed satellite hospital under certain conditions. On April 24, 1974, CLHA approached the Home State Bank, as trustee, and asked it to contribute $108,000 out of the Ames trust to CLHA so it could exercise its option and purchase 44 acres of Site B for the development of a hospital. Home State Bank agreed, and thereafter, the purchase was consummated.

Home State Bank then leased Site B to the CLHA for the sum of $1 per year provided that CLHA utilize the property in connection with the future construction and operation of a hospital facility. At this time, however, pursuant to the then newly enacted certificate of need legislation, the Illinois Health Facilities Planning Board adopted a plan that, through 1976, there was only a need for an additional six hospital beds in McHenry County. The plans for a 125-bed satellite facility were thereby foreclosed. In response to this legislative obstruction, Sherman and the CLHA agreed to erect an ambulatory health care facility, the Crystal Lake Ambutal, on part of the Site B location. Shortly thereafter, in 1976, the Home State Bank, as trustee, notified Sherman Hospital that the funds in the Ames trust would not be available for use in construction of the Crystal Lake Ambutal. On or

about March 17, 1977, Home State Bank, as trustee, the CLHA, and Sherman Hospital entered into an agreement where Sherman Hospital would purchase the real estate upon which the Ambutal is currently located, terminating the interests of Home State Bank and CLHA. Accordingly, Home State Bank's initial contribution from the Ames trust was refunded.

The CLHA, through fund-raising efforts among citizens of Crystal Lake, raised approximately $1.2 million, which was applied toward the construction of the Crystal Lake Ambutal at its present site. On May 26, 1978, Sherman Hospital/Crystal Lake Ambutal opened and began providing out-patient medical services to the general public.

On or about December 27, 1982, as the 20-year trust limitation deadline neared, the three plaintiff not-for-profit corporations, Crystal Lake Ambutal, NIMC and Memorial Hospital, each filed separate causes of action below alleging that they were qualified recipients under the provisions of the Ames trust.

The 20-year limitation period expired on February 8, 1983, and the Home State Bank, as trustee, had not yet distributed the funds in accordance with Ames' primary purpose of erecting a hospital in or near Crystal Lake. In defense of its failure to distribute the trust proceeds, the trustee noted that it could not fulfill Ames' primary purpose because the trust was insufficiently funded.

In a letter dated April 29, 1983, the trustee stated that by February 8, 1983, 20 years after Mr. Ames' death, no hospital had been established "in or near Crystal Lake." The trustee noted that the area hospitals, Memorial, NIMC and Sherman, were all in existence when Mr. Ames' executed his will and "presumably, therefore, he did not intend that any of them be the beneficiary of his gift." The trustee also reasoned that Ambutal, although "in or near the city of Crystal Lake is not a hospital," and that "it is apparent that Mr. Ames' vision of a single hospital located in, identifiable with, and principally serving Crystal Lake, will not be realized." Instead, the trustee decided to distribute the funds pursuant to the charitable trust's alternative gift over provision. It then concluded that the proceeds of the trust should be awarded to the Crystal Lake Public Library, which was built and maintained exclusively for persons residing "in or near Crystal Lake." This charitable award was subsequently accepted by the library; however, the funds will only be distributed pending the outcome of the instant litigation.

In addition to the above named plaintiffs, two parties were permitted to intervene in the consolidated actions. The city of Crystal Lake, intervenor-appellee in appeal Nos. 84—0628, 84—0629 and 84—

0648, was permitted to intervene on behalf of the Crystal Lake Public Library. Neil F. Hartigan, the Attorney General of the State of Illinois, was also allowed to intervene and file a petition for construction of trust and instructions pursuant to its common law authority. (See *Metropolitan Sanitary District of Greater Chicago ex rel. O'Keeffe v. Ingram Corp.* (1981), 85 Ill. 2d 458, 478-79, 426 N.E.2d 860; *In re Estate of Tomlinson* (1976), 65 Ill. 2d 382, 387-88, 359 N.E.2d 109; *People ex rel. Hartigan v. National Anti-Drug Coalition* (1984), 124 Ill. App. 3d 269, 275, 464 N.E.2d 690.) The petition requested the court to construe Ames' testamentary trust and urged that NIMC, Memorial Hospital and Crystal Lake Ambutal all were entitled to the charitable bequest. The Attorney General has separately appealed the trial court's adverse ruling in appeal No. 84—0629. No issue has been raised in these appeals concerning the Attorney General's right to intervene or whether he can assert a construction of the trust in favor of a party who has lost below and has not appealed, or in favor of a party who may be barred by the doctrines of *res judicata* or collateral estoppel. We, therefore, need not examine these matters unnecessarily.

The trustee-defendant, Home State Bank, filed motions to dismiss pursuant to sections 2—615 and 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, pars. 2—615, 2—619) alleging, *inter alia*, that the plaintiffs did not qualify as beneficiaries under the terms of the trust and that both NIMC's and Crystal Lake Ambutal's actions were barred by the doctrine of *res judicata* and/or collateral estoppel based upon the prior 1981 court decision that neither party was a qualified charitable beneficiary. These motions were denied by the court below on all grounds.

The three actions were consolidated and tried without a jury before Judge Leonard Brody in May 1984. In a June 8, 1984, order, judgment was entered against all plaintiffs and in favor of the trustee-defendant, Home State Bank. The relief requested by the Attorney General was also denied.

In rendering his decision, Judge Brody reasoned that "[i]n or near Crystal Lake in his day and in his mind had to mean the city of Crystal Lake and that and that alone. *** And, I think when Mr. Ames died he spoke of a hospital institution in or near Crystal Lake and he had to exclude the existing hospital and existing community of McHenry ***."

The court also specifically noted that "Ambutal is not a hospital within the meaning of the word hospital as contemplated by Mr. Ames *** generically a hospital would be a place where one as you might

say had in-patients, where one may reside over a period of time for the care of the sick as well as the injured. He specifically used that word in his Will and the very nature of Ambutal seems to be an emergency thing.'' Finally, the trial judge ruled that none of the plaintiffs were entitled to a distribution of the trust proceeds under the doctrine of equitable deviation.

In its June 8, 1984, order, the trial court also entered the following specific findings:

"1. McHENRY HOSPITAL, as it existed at the death of THOMAS W. AMES, and NORTHERN ILLINOIS MEDICAL CENTER are one and the same corporate entities. The change of name or reorganization does not make it a new corporation as contemplated by THOMAS W. AMES in his Will.

2. NORTHERN ILLINOIS MEDICAL CENTER, although at a new location, is not in or near the City of Crystal Lake as contemplated by THOMAS W. AMES in his Will.

3. McHENRY HOSPITAL was in existence at the time of THOMAS W. AMES' death.

4. The trustee did not select the site or location of either McHENRY HOSPITAL or the new NORTHERN ILLINOIS MEDICAL CENTER facility.

\* \* \*

9. Ambutal was not incorporated or otherwise in existence as a hospital on the date of THOMAS W. AMES' death.

10. The trustee did not select the site or location of the Ambutal.

11. Ambutal is in the City of Crystal Lake.

12. Ambutal is not a hospital as contemplated by THOMAS W. AMES in his Will.

13. SHERMAN HOSPITAL was in existence at the time of THOMAS W. AMES' DEATH.

14. SHERMAN HOSPITAL is not in or near Crystal Lake as contemplated by THOMAS W. AMES in his Will.

15. SHERMAN HOSPITAL is in the same location as it was at the time of the death of THOMAS W. AMES.

16. CRYSTAL LAKE HOSPITAL ASSOCIATION does not own or operate a hospital nor has it ever owned or operated a hospital.''

NIMC, Crystal Lake Ambutal, and the Attorney General have all appealed the decision of the court below. These appeals are docketed under Nos. 84—0628, 84—0648 and 84—0629 respectively, and have been consolidated for the purposes of our review. Memorial Hospital

of Woodstock, however, has not appealed the trial court's adverse decision.

NIMC, Crystal Lake Ambutal, and the Attorney General first contend that this court should construe the Ames charitable trust provisions and resolve the instant case as a matter of law, independent of any findings entered by the court below. In support of this position, they maintain that the evidence adduced at trial was primarily documentary in nature and that no issues of material fact exist, rendering the instant case appropriate for resolution as a matter of law.

Generally, a court of review will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110, 382 N.E.2d 1205.) Construction and the legal effect of an instrument, however, raise a question of law. Consequently, where the material facts are not in dispute, the rule that a court of review may set aside the findings of the trial court only when contrary to the manifest weight of the evidence has no application. (*First National Bank v. Canton Council of Campfire Girls, Inc.* (1980), 81 Ill. App. 3d 932, 935, 401 N.E.2d 1293, *rev'd on other grounds* (1981), 85 Ill. 2d 507, 426 N.E.2d 1198; *Illinois Valley Asphalt, Inc. v. La Salle National Bank* (1977), 54 Ill. App. 3d 317, 320, 369 N.E.2d 525.) We also recognize that where the evidence before the trial court is entirely documentary in nature, the appellate court is not bound by the trial court's findings and may make an independent decision on the facts. *Schlobohm v. Police Board* (1984), 122 Ill. App. 3d 541, 544, 461 N.E.2d 601; *Delasky v. Village of Hinsdale* (1982), 109 Ill. App. 3d 976, 980, 441 N.E.2d 367.

■■ Our review of the record reveals that the evidence adduced at trial consisted of a substantial amount of oral testimony in addition to much documentary evidence. Thus, the above-noted exceptions to the manifest weight standard of review are inapplicable here. Moreover, the record indicates that several disputed questions of fact exist. However, we do find that while the trial judge in his June 8, 1984, order resolved what he terms questions of fact in favor of the trustee, Home State Bank, many of his specific findings are actually conclusions of law. Consequently, a strict manifest weight of the evidence standard of review is also inappropriate. Rather, under these unique circumstances, we conclude that the instant case presents mixed questions of law and fact. The actual findings of fact entered by the court below must be deferred to on review unless against the manifest weight of the evidence, while we must engage in our own independent analysis and resolve as matters of law issues relating to the applica-

tion of the facts to the legal construction of the charitable trust instrument.

■■ Next, we must address, due to its possible preclusive effect, Home State Bank's contention, raised in its appellee's brief, that the plaintiffs are precluded by the doctrines of *res judicata* and/or collateral estoppel from maintaining the instant suits. Specifically, Home State Bank asserts that both NIMC and Ambutal are attempting to relitigate matters previously determined, or which should have been raised and determined, in the prior 1975-1981 litigation. At the outset, we note that Home State Bank's failure to file a cross-appeal in the present appeals raising these defenses does not foreclose our consideration of them on appeal, as they were presented at trial and no part of the judgment entered below was adverse to Home State Bank. *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387-88, 457 N.E.2d 9.

Our supreme court has recently stated that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action. (*Housing Authority v. YMCA* (1984), 101 Ill. 2d 246, 251, 461 N.E.2d 959.) When *res judicata* is applied, all issues which were or could have been raised in the prior suit are barred from subsequent consideration. 101 Ill. 2d 246, 251-52, 461 N.E.2d 959; *Cravens v. Huff* (1985), 131 Ill. App. 3d 787, 790, 476 N.E.2d 59.

The doctrine of collateral estoppel applies when a party or someone in privity with that party participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction. (*Housing Authority v. YMCA* (1984), 101 Ill. 2d 246, 252, 461 N.E.2d 959.) The judgment in the first suit operates as an estoppel only as to the point actually litigated and determined, not as to other matters which might have been litigated and determined. 101 Ill. 2d 246, 252, 461 N.E.2d 959.

At the conclusion of the earlier litigation, Judge Sullivan issued a memorandum opinion in July 1981, in which he specifically concluded that Ambutal, as it then existed, was not a hospital within the meaning of the Ames trust bequest. The court also, in an order filed September 17, 1981, entered its further finding that McHenry Hospital (now NIMC), as it then existed, was not "in or near the City of Crystal Lake" within the contemplation of the Ames trust. However, in

entering judgment against all plaintiffs, the court explicitly noted "that at the time of entry of this order, the cause is not ripe for the application of *cy pres* or any other such equitable doctrine."

In the subsequent litigation held below, NIMC and Crystal Lake Ambutal both raise the same alternative grounds for relief as they raised in the earlier suits. First, that they are now entitled to the trust proceeds under a reasonable construction of the trust provisions and alternatively, that they are entitled to the proceeds under the doctrine of equitable deviation.

Addressing their latter contention first, it is clear, in view of Judge Sullivan's explicit statement that he had not considered any equitable theories for relief, that both NIMC's and Ambutal's current claims based upon equitable deviation are unaffected by the earlier litigation. Moreover, in 1981 the equitable causes of action were not ripe, as the Ames 20-year limitation had not yet expired and, presumably, either plaintiff or a separate entity could have still established a hospital prior to February 8, 1983, within 20 years of Ames' death.

In support of their claims to the trust proceeds based upon a reasonable construction of the trust provisions, both NIMC and Ambutal maintain that there has been a significant change in the factual posture of their cases since 1981. NIMC asserts that in 1981 its new facility, located 4.18 miles from the northern boundary of Crystal Lake, was not in existence and was not considered by the court below. Similarly, Ambutal asserts that since the 1981 decision it has significantly increased the out-patient services provided to the public and accordingly, it is now within the contemplation of the Ames trust.

■ The rule in Illinois is that *res judicata* extends only to the facts and conditions as they were at the time a judgment was rendered. When new facts or conditions intervene before a second action, establishing a new basis for the claims and defenses of the parties respectfully, the issues are no longer the same, and the former judgment cannot be pleaded as a bar in a subsequent action. (See *Ropacki v. Ropacki* (1933), 354 Ill. 502, 506-07, 188 N.E. 400; *Chicago Title & Trust Co. v. County of Cook* (1983), 120 Ill. App. 3d 443, 454, 457 N.E.2d 1326.) We find this principle equally applicable to the doctrine of collateral estoppel.

■ Our examination of the record reveals that both NIMC and Ambutal have demonstrated that a significant and material change in the facts, within the context of their individual positions, has occurred since the 1981 decision was entered. Accordingly, we conclude that NIMC and Ambutal are not precluded from asserting their respective theories of recovery under the doctrine of *res judicata* or from litigat-

ing any relevant issues with respect thereto under the doctrine of collateral estoppel.

As the Attorney General was not a party, or in privity with any party in the earlier litigation, its current position is also unaffected by the prior decision.

■ Both NIMC and Crystal Lake Ambutal next contend that they are entitled to distribution of the charitable bequest under a reasonable construction of the Ames trust provisions and that the trial court erred in excluding them as beneficiaries. Individually, both organizations maintain that distribution of the proceeds to their respective facilities would fulfill Ames' primary purpose of establishing a hospital serving the residents of Crystal Lake. In its appeal, the Attorney General maintains that awarding the trust proceeds to any of the three health care institutions, NIMC, Ambutal, and Memorial Hospital, which has not appealed the decision below, would fulfill Ames' primary purpose which he broadly construes as providing funds for "a new hospital facility or facilities serving the Crystal Lake area."

In response, defendant-trustee Home State Bank and intervenor, the city of Crystal Lake, maintain that NIMC is not entitled to the proceeds under the provisions of the trust because it was in existence at Mr. Ames' death, it is not located "in or near the City of Crystal Lake," its site was not selected by the trustee, and it was not operational within the 20-year limitation period. They also collectively maintain that Crystal Lake Ambutal is not entitled to the funds because Ambutal is not a hospital within the contemplation of the Ames trust.

Prior to addressing the issues of whether NIMC and Ambutal have met the individual requirements for disposition of the trust monies, we must first determine Mr. Ames' purpose and intent underlying his charitable bequest.

The purpose of judicial construction of a trust instrument is to ascertain the intent of the settlor and carry it out. (*In re Support of Halas* (1984), 104 Ill. 2d 83, 92, 470 N.E.2d 960; *First National Bank v. Canton Council of Campfire Girls, Inc.* (1981), 85 Ill. 2d 507, 513, 426 N.E.2d 1198.) In determining that intent, the court must consider the plain and ordinary meaning of the words used and the intent must be ascertained by considering the entire document as a whole. (85 Ill. 2d 507, 513, 426 N.E.2d 1198.) The provisions of the instrument are not to be read in isolation. (*In re Support of Halas* (1984), 104 Ill. 2d 83, 92, 470 N.E.2d 960.) The court, however, is limited to establishing not what the settlor meant to say, but what was meant by what he did say. (*Williams v. Springfield Marine Bank* (1985), 131 Ill. App. 3d 417, 420, 475 N.E.2d 1122.) The court may consider the surrounding

circumstances at the time the instrument was executed, to the extent they may aid in determining the settlor's intention in using certain language. *First National Bank v. Canton Council of Campfire Girls* (1981), 85 Ill. 2d 507, 514, 426 N.E.2d 1198.

We believe, after a careful reading of paragraph 11, that Ames' intended purpose underlying his charitable bequest was to establish a new hospital, not in existence at the time he executed his will, which would provide hospital services to the citizenry of, and be principally identified with, the city of Crystal Lake. This overriding intent in primarily benefiting the citizens of Crystal Lake may also be gleaned from his alternative bequest (see *Burr v. Brooks* (1981), 83 Ill. 2d 488, 500, 416 N.E.2d 231), to be made at the discretion of the trustee "for the best interest and welfare of the people residing in Crystal Lake."

Furthermore, the surrounding circumstances at the time Ames executed his will also evinces his desire that a hospital be established to provide hospital services to the citizenry of, and to be principally identified with, the city of Crystal Lake.

In 1962, Crystal Lake would best be described as a rural community. At that time, most of the neighboring municipalities had their own hospitals. McHenry Hospital was located in and identified with the city of McHenry; Memorial Hospital was located in and identified with the city of Woodstock; and Sherman Hospital was located in and identified with the city of Elgin. Crystal Lake, unlike its neighboring communities, did not have a hospital facility identifiable with its community at that time. Moreover, in 1962 these neighboring hospitals were located between 6 to 13 miles from the nearest boundary of Crystal Lake. Viewing these surrounding circumstances, in conjunction with our plain reading of paragraph 11, it is evident that Ames intended that his bequest be used for something more than a mere donation to a neighboring facility providing hospital services to Crystal Lake residents. Instead, as noted above, we believe that his primary objective was that his bequest be utilized to establish a hospital which would provide health care services to the citizens of, and be principally identified with, the city of Crystal Lake. In view of Ames' intent, we find the arguments of NIMC, Ambutal, and the Attorney General with respect to the distribution of the trust proceeds under a reasonable construction of the provisions of paragraph 11, unpersuasive.

Assuming the Attorney General through its intervenor status can assert Memorial Hospital's rights where Memorial has not appealed, we conclude that Memorial is not an entity within the contemplation of the Ames trust. Although additional facilities have been built onto

its hospital, today, Memorial Hospital exists in the same location as it did in 1962 when Mr. Ames executed his will. We believe that had Ames intended the trust proceeds to be distributed to Memorial, he would have made an outright bequest to it at the time of the execution of his will.

Similarly, we also do not believe that Crystal Lake Ambutal qualifies as an intended beneficiary under the terms of the trust. On appeal, Ambutal maintains that it is a hospital within the ordinary meaning of the word and focuses on the isolated trust language "for the diagnosis, treatment, medical care and cure of sick, injured and diseased persons," in an attempt to show that it is a hospital or functions as a hospital as contemplated by Thomas Ames. Ambutal also argues that it is an "out-patient hospital," and, as such, complies with the terms of the Ames will. Finally, Ambutal contends that because of its common ownership with Sherman Hospital, it falls within the definition of a hospital. We believe Ambutal's arguments are untenable.

While Ambutal does provide many services "for the diagnosis, treatment, medical care and cure of sick, injured and diseased persons," we conclude it is not a hospital as contemplated by Mr. Ames at the time he executed his will in 1962. In examining the circumstances surrounding the execution of the Ames will, it is apparent that he did not intend an out-patient emergency facility to fit within his ascribed meaning of the word hospital. Mr. Ames was a long time resident of Crystal Lake, and in 1962 it is highly doubtful that an ambulatory care facility, at that time a virtually nonexistent entity in most areas let alone in rural Crystal Lake, was what he had intended by his repeated use of the word hospital in paragraph 11. Moreover, at oral argument, Ambutal recognized that its facility is a modern pioneer in the health services field and that such ambulatory out-patient care facilities were not in existence in 1962.

Ambutal does not provide many of the services provided by a hospital. It does not have an obstetrics, medical-surgical, intensive care, or pediatric department. Ambutal is not licensed as a hospital, and does not fall within the definition of a hospital under the Illinois Hospital Licensing Act (Ill. Rev. Stat. 1983, ch. 111½, par. 144). Its affiliation with Sherman Hospital in Elgin, some 12.6 miles away from Crystal Lake, is clearly insufficient to bring Ambutal within the terms of the trust. Sherman Hospital was in existence at the time of the execution of the will, and was obviously not thought by Ames to be "in or near" Crystal Lake, or otherwise it would have been granted an outright bequest. While Ambutal has cited a number of out-of-State decisions in support of its broad construction of the term hospital, we

find those cases factually and legally inapposite. There is no evidence in this record that the out-patient services rendered by Ambutal, although reflecting a modern trend in medical services, fit within the definition of the word hospital as contemplated by Mr. Ames at the time he executed his will in 1962.

Finally, we also do not believe that NIMC qualifies as an intended recipient under a reasonable construction of the trust provisions. NIMC maintains that its new facility meets the Ames criteria of being a hospital located "in or near Crystal Lake." Evidence adduced at trial showed that NIMC's new facility is located 4.18 miles and approximately five minutes from the northern boundary of Crystal Lake. It is now located 2.2 miles closer to Crystal Lake, and is on the outskirts of McHenry rather than in the business district where the old hospital is located. Essentially, NIMC contends that Ames' intent in directing that the new hospital be located "in or near" Crystal Lake was to insure that the new hospital would be near enough to Crystal Lake to provide hospital services to Crystal Lake residents and other persons in the area. It argues that the new hospital comes within this directive in the trust.

Depending upon where a Crystal Lake resident resides, however, he may have to travel past commercial enterprises, retail establishments, a new residential subdivision, a railroad crossing, and possibly through neighboring municipalities to reach NIMC's new location. While NIMC's new facility is the closest hospital to Crystal Lake's northern boundary in terms of linear distance, it is still located within the city of McHenry and may be logically identified with the city of McHenry. Moreover, the distance between the northern boundary of Crystal Lake and the new hospital in McHenry is still characterized as rural, thereby further indicating the same condition as was present in 1962 and a lack of identification with the city of Crystal Lake. Geographically, NIMC is only 2.2 miles closer to Crystal Lake than the old McHenry Hospital and is still located in the city of McHenry. There was no evidence introduced of increased population in Crystal Lake in the northern boundary area as compared with that in 1962. In fact, the appellees' evidence that the residential population was in the southern portion of the city of Crystal Lake was improperly excluded.

Evidence adduced at trial also indicates that Crystal Lake residents make up only a small percentage of the total in-patient population of NIMC over the recent years prior to the trial in 1984. Whether the new facility, not yet completed at the time of trial, would attract more Crystal Lake residents is speculative, and no evidence

was offered to show any anticipated increase.

Both NIMC and Home State Bank cite numerous cases in support and opposition of the fact that 5 miles is, or is not, within the meaning of the term "near." However, as with the other provisions of the trust, the meaning Mr. Ames ascribed to the terms "in or near Crystal Lake" must be gleaned from his intent and the circumstances surrounding the execution of his will. In view of the surrounding circumstances at the time of the execution of the will, as noted above, we conclude that NIMC, although nearer to Crystal Lake in terms of linear distance than the old McHenry Hospital, is located in, and associated with, the city of McHenry and is not principally identified with, and does not primarily serve the citizens of the city of Crystal Lake in accordance with Ames' intent underlying the charitable bequest.

As we find this issue dispositive of whether NIMC was an intended beneficiary under the express terms of the charitable trust, we need not discuss NIMC's compliance with the remaining trust requirements.

■ In their alternative arguments, NIMC and Crystal Lake Ambutal next maintain that this court should sanction a deviation from the terms of the trust instrument to effectuate Thomas Ames' primary purpose of establishing a hospital in or near Crystal Lake. The Attorney General also urges this court to sanction such a deviation to fulfill Ames' primary objective which, according to the Attorney General's broad interpretation, was to provide funds to hospital facilities serving the Crystal Lake area.

Our supreme court recently recognized the doctrine of equitable deviation, despite finding it inapplicable under the circumstances, in *Burr v. Brooks* (1981), 83 Ill. 2d 488, 496, 416 N.E.2d 231. In adopting section 381 of the Restatement (Second) of Trusts (1959), the *Burr* court stated:

"The doctrine of equitable deviation is stated in section 381 of the Restatement (Second) of Trusts, at 273 (1959), as follows:

'The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.' " (*Burr v. Brooks* (1981), 83 Ill. 2d 488, 496, 416 N.E.2d 231; see also Bogert, Trusts & Trustees sec. 394, at 250-51 (2d rev. ed. 1977); Scott, Trusts sec. 381, at 2983 (3d ed. 1967).)

The court also distinguished the related doctrine of *cy pres*, noting

that "[t]he distinction between *cy pres* and equitable deviation is explained by comment *a* to section 381, which states in part:

'The rule stated in this Section has to do with the powers and duties of the trustees of charitable trusts with respect to the administration of the trust; it has to do with the methods of accomplishing the purposes of the trust. The question of the extent to which the court will permit or direct the trustee to apply the trust property to charitable purposes other than the particular charitable purpose designated by the settlor where it is or becomes impossible or illegal or impracticable to carry out the particular purpose involves the doctrine of cy pres, which is dealt with in section 399.' Restatement (Second) of Trusts sec. 381, comment *a*, at 273 (1959)." (83 Ill. 2d 488, 496-97, 416 N.E.2d 231.)

The distinction between these two equitable doctrines was also recently noted by the Court of Appeals of New York in *In re Estate of Wilson* (1983), 59 N.Y.2d 461, 465 N.Y. Supp. 2d 900, 452 N.E.2d 1228. The *Wilson* court emphasized that the doctrine of equitable deviation applies only to matters affecting trust administration, noting that:

"When an impasse is reached in the administration of a trust due to an incidental requirement of its terms, a court may effect, or permit the trustee to effect, a deviation from the trust's literal terms (see 9A Rohan, NY Civ. Pract., pars. 7—2.4[3]—7—2.4[4]). This power differs from a court's cy pres power in that '[t]hrough exercise of its deviation power the court *alters or amends administrative provisions in the trust instrument but does not alter the purpose of the charitable trust or change its dispositive provisions*' (Bogert, Trusts and Trustees [rev. 2d ed.], sec. 394, p. 249; ***)." (Emphasis added.) (*In re Estate of Wilson* (1983), 59 N.Y.2d 461, 475, 465 N.Y. Supp. 2d 900, 906, 452 N.E.2d 1228, 1234. See also *Sendak v. Trustees of Purdue University* (1972), 151 Ind. App. 372, 279 N.E.2d 840.)

It is also clear that under the doctrine of equitable deviation, unlike the doctrine of *cy pres*, a testator's primary charitable objective will be given effect despite the fact that an alternative distribution is provided for in the event the primary objective fails. See *Village of Hinsdale v. Chicago City Missionary Society* (1940), 375 Ill. 220, 234, 30 N.E.2d 657; *Burr v. Brooks* (1979), 75 Ill. App. 3d 80, 86, 393 N.E.2d 1091, *aff'd* (1981), 83 Ill. 2d 488, 416 N.E.2d 231.

▮ Under normal circumstances, such administrative deviations

are sanctioned, if all other requirements are met, upon the application of the trustee. However, we do not believe that potential beneficiaries or persons having a special interest in the enforcement of a charitable trust are precluded from seeking the application of equitable deviation where they are clearly potential recipients under the trust's provisions. (See generally Restatement (Second) of Trusts sec. 391, at 278-79 (1959).) This interpretation is consistent with long standing principles of liberal construction afforded to charitable bequests in Illinois. *Stubblefield v. Peoples Bank of Bloomington* (1950), 406 Ill. 374, 384, 94 N.E.2d 127; *Village of Hinsdale v. Chicago City Missionary Society* (1940), 375 Ill. 220, 231-32, 30 N.E.2d 657.

As noted above, we believe Mr. Ames' overriding intent and purpose was to benefit the citizens of Crystal Lake through the establishment of a hospital which would be identified with the city and primarily serve its citizens within 20 years of his death. His secondary objective was simply to benefit the citizens of Crystal Lake through a contribution to any worthwhile charity to be selected by the trustee. Thus, if equitable deviation is applicable, it must be in furtherance of Ames' primary purpose.

■ In its alternative contention, Crystal Lake Ambutal maintains that if this court does not find it to be a hospital within the meaning of the Ames will, Ames' primary purpose can still be effectuated by awarding the charitable bequest to Ambutal under the doctrine of equitable deviation.

In *Burr v. Brooks* (1981), 83 Ill. 2d 488, 416 N.E.2d 231, our supreme court declined to sanction deviation from a trust's provisions providing that certain charitable funds were to be used to erect a hospital under substantially similar circumstances. In *Brooks*, the city, as trustee, contended that there were already sufficient hospitals in the area and requested the authority to use the trust funds to provide health care for the indigent and to establish a family care and diagnostic center. In denying the requested deviation, the court, quoting from the appellate court's decision, stated that " 'Although the health facility would aid the sick, disabled and injured and serve a charitable purpose, it is not a hospital.' " The court also held that the city's proposals were more of a change of the provisions of the trust instrument than merely a matter of administration. 83 Ill. 2d 488, 499, 416 N.E.2d 231; *Burr v. Brooks* (1979), 75 Ill. App. 3d 80, 393 N.E.2d 1091.

We find this analysis equally applicable under the circumstances of the instant case. As Ambutal is primarily an emergency out-patient facility and not a hospital as contemplated by Ames, the requested de-

viation from the terms of the trust would affect Ames' primary purpose and not merely matters of trust administration. Consequently, we conclude that the doctrine of equitable deviation is not applicable as to Ambutal.

In its alternative argument, NIMC maintains that Mr. Ames' primary objective of establishing a hospital in or near Crystal Lake may be fulfilled by deviating from the express language of the trust and awarding the proceeds to NIMC. In support of its position, NIMC suggests that this court sanction deviations concerning the majority of the provisions of the trust, including (1) the incorporation of a not-for-profit hospital foundation, (2) the location of the new NIMC facility outside Crystal Lake, (3) the trustee's right to select the site, and (4) the 20-year limitation period.

We believe that sanctioning the deviations requested by NIMC would result in a major change in trust purpose, because we do not find its new location to be "in or near" the city of Crystal Lake. The requested deviation would subvert Ames' primary purpose of establishing a hospital principally identified with, and primarily serving the citizenry of, the city of Crystal Lake. Moreover, sanctioning the requested four deviations would result in a substantial alteration of the trust's dispositive provisions and not merely affect trust administration. Accordingly, we conclude that the doctrine of equitable deviation is equally inapplicable as to NIMC.

We also find the doctrine of equitable deviation inapplicable to Memorial Hospital, which the Attorney General has included within its asserted class of potential recipients under this equitable theory. While Memorial has added additional facilities to its hospital, currently it exists in the same location as it did in 1962 when Mr. Ames executed his will. As noted above, it is our opinion that had Ames intended the trust proceeds to be distributed to Memorial, he would have included an outright bequest to it. Accordingly, we conclude that sanctioning a deviation under these circumstances would result in a major change in trust purpose and not merely affect the trust's administrative provisions.

NIMC next contends that the trial court erred in excluding certain evidence on the basis of relevance and materiality. Evidence is relevant where it tends to prove a matter in controversy. (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 519, 468 N.E.2d 1228; *Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768.) Evidence is material where it has a legitimate bearing on disputed matters. (*Sorenson v. Fio Rito* (1980), 90 Ill. App. 3d 368, 374, 413 N.E.2d 47.) The determination of whether particular evidence is relevant is within the dis-

cretion of the trial court and will not be disturbed absent an abuse of discretion. *Benson v. Bradford Mutual Fire Insurance Corp.* (1984), 121 Ill. App. 3d 500, 510, 459 N.E.2d 689.

Specifically, NIMC contends that the trial court improperly excluded copies of the articles of incorporation and bylaws of NIMC's two companion corporations. NIMC maintains that this evidence was relevant to demonstrate the reorganization of McHenry Hospital into several new entities. The record reveals, however, that Mr. John Cain, president and chief executive of NIMC, gave detailed testimony concerning McHenry Hospital's reorganization as it related to NIMC. Moreover, the two other corporations were not parties to this action. Under these circumstances, we conclude that the excluded evidence was merely cumulative and thus, the trial court's evidentiary ruling did not amount to an abuse of discretion.

NIMC next contends that the trial court improperly excluded evidence of the financing obtained, the actual money spent, and the debts incurred by NIMC in connection with establishing its new facility. NIMC maintains that this evidence was relevant to show that it had substantially established its new hospital within the 20-year limitation period and that Ames intended to assist "in those steps taken which were taken to establish a new hospital within twenty years of his death." The amount of financing incurred or funds expended has no bearing on whether a hospital was established "in or near" Crystal Lake within 20 years of Ames' death, since substantial completion was not an issue to be resolved by the court. Accordingly, the trial court's exclusion of this evidence as irrelevant also did not amount to an abuse of discretion.

Finally, NIMC contends that the trial court improperly excluded the testimony of Mr. Raymond Passeri, executive director of the Illinois Health Facilities Board, concerning: "(a) the criteria and the manner in which the Board applied the relevant criteria in designating McHenry County a 'service area' for health care planning purposes; (b) the criteria and the manner in which the Board applied the criteria in reviewing and approving Northern Illinois Medical Center's application for a certificate of need permit to establish a new hospital; and (c) the impact which the certificate of need legislation had with regard to establishing a new hospital." NIMC maintains this evidence was relevant to its equitable deviation theory and to show that literal compliance with the Ames' trust provisions was not possible. The trial court, however, admitted the rules and regulations of the Illinois Health Facilities Planning Board into evidence and also took judicial notice of all the applicable statutes. As these are matters of public

record, any extraneous or parol evidence explaining, altering, varying or enlarging them is inadmissible. *People ex rel. Nelson v. Beu* (1949), 403 Ill. 232, 247, 85 N.E.2d 829.

Furthermore, on this record, even assuming these three evidentiary rulings resulted in some error, we cannot say it was of sufficient magnitude to cause prejudice to NIMC or that it materially affected the outcome of the litigation below. *J.L. Simmons Co., Inc. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 115.

While Home State Bank, in its appellee's brief, also assigns as error several evidentiary rulings of the trial court, we need not address them in light of our decision above.

For the foregoing reasons, the decision of the circuit court of McHenry County is affirmed.

Affirmed.

HOPF and SCHNAKE, JJ., concur.